Automotive Bin Service Company, a Michigan corporation v. Commissioner.
Automotive Bin Serv. Co. v. Commissioner
Docket No. 34045.
United States Tax Court
1953 Tax Ct. Memo LEXIS 209; 12 T.C.M. (CCH) 689; T.C.M. (RIA) 53215; June 18, 1953
Melvin S. Huffaker, Esq., 2766 Penobscot Building, Detroit, Mich., and Pell Hollingshead, Esq., for the petitioner. James A. Scott, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in income tax, declared value excess profits tax and excess profits tax against the petitioner as follows: Declared
Income
value excess
Excess
Year
Tax
profits tax
profits tax
1944
$ 472.66
$ 479.39
$ 4,117.85
1945
3,034.43
25,220.77
1946
9,893.17
1947
12,759.53
Issues presented for determination are whether the respondent erred (1) in determining that a portion of the deductions taken by petitioner for the years 1944 through 1947 as compensation paid to Rex R. Brubaker, an officer and sole stockholder of *210 the petitioner, represented unreasonable compensation and was not deductible in computing taxable net income; (2) in determining that an amount of $8,328.41 deducted by petitioner in 1945 and representing the total amount paid by petitioner to Rex R. Brubaker in that year in excess of the amount of petitioner's obligations paid by him in said year was not deductible as a part of the cost of sales in computing petitioner's gross income or as an ordinary and necessary business expense; (3) in determining that a portion of the deductions taken by petitioner for 1945 1946 and 1947 as traveling expenses of Rex R. Brubaker were not deductible; (4) in determining that commissions in the amount of $2,528.96 received by petitioner during 1946 and credited by it on its books to Rex R. Brubaker constituted taxable income to the petitioner for that year; (5) in determining that an amount of $2,692.30 deducted for maintenance and repairs for 1945 represented capital expenditures; (6) in determining the amount of depreciation deductible by the petitioner in 1945, 1946 and 1947; and (7) in determining the amount deductible by petitioner for bad debts for 1947. General Findings of Fact A portion *211 of the facts have been stipulated and are found accordingly. The petitioner is a Michigan corporation, organized in 1936, and has its principal place of business in Detroit, Michigan. Its income and excess profits tax returns for the years 1944 through 1947, prepared from books kept on an accrual basis, were filed with the collector for the district of Michigan. The petitioner was organized with an authorized capital stock of $5,000 divided into 50 shares of a par value of $100 each, of which 35 shares were issued. During 1946 the par value of the petitioner's stock was reduced to $10 a share, and the authorized capital stock was increased to $50,000 composed of 5,000 shares of a par value of $10 each. During that year its issued stock was increased from $3,500 par value to $11,000 par value and during 1947 was further increased to $27,000. From the time of the petitioner's incorporation in 1936 through 1947 Rex R. Brubaker was the owner of all the issued stock of the petitioner. During 1944 he was treasurer of the petitioner. In February 1945 he was elected president and continued to be such through 1947. Issue 1. Compensation of Rex R. Brubaker Findings of Fact After *212 having obtained a high school education and after service in World War I, Rex R. Brubaker began work as a salesman for R. J. Reynolds Tobacco Company. Subsequently and until about 1926 he worked for several other enterprises as salesman or sales manager. About 1926 he entered the employment of Berger Manufacturing Company, which manufactured steel shelving, storage bins and metal office furniture. Berger employed him as an exclusive automotive representative to sell steel automotive bins to automobile dealers in a specified territory. He was paid a commission of 15 per cent on net sales. After he began working for Berger, Brubaker found that the automobile manufacturers made and distributed to dealers for sale many thousands of differently numbered parts used in the repair of automobiles. He also found that the manufacturers supplied dealers with a blue print of a parts storage system based on national averages and which made no provision for the differences in parts requirements in different geographical sections due to the effects of temperature, dust, terrain and similar variants on driving needs and parts wear. He further found that the numbering systems used by some car manufacturers *213 at that time seriously impaired efficient storage of automotive parts. The numbering system used by one large car manufacturer was based on the alphabet. As a result, different parts which fit together in a repair job might be stored at opposite ends of the parts storage system. In the case of at least one manufacturer, truck parts were numbered by a separate numbering system even where identical with their passenger car counterparts. From the automobile dealer's point of view the then current system of parts storage was inefficient. In addition to the waste of time and labor in ordering, storing and finding parts caused by the numbering systems then in use and in addition to the necessity, resulting from the manufacturers' national average system, of carrying parts for which he had little use in his particular geographical location or type of neighborhood, the dealer was at the mercy of the man he employed to store and control the parts. Since the storage systems were usually built from standard bins and shelves and did not allow for future parts, new bins or shelves were usually set up at the end of the system as new parts were produced. The result usually was that in a very short *214 time the parts man was the only one who knew where many of the parts were stored. Several months after he entered the employment of Berger, Brubaker began developing the idea in connection with the sale of bins to automobile dealers of furnishing an additional service whereby he would design the bins to fit each dealer's special requirements. Brubaker began ordering bins from Berger on his own account, setting them up in accordance with his service idea, and then sold them to the dealers. As a result of such service, he became known in 1927 as "Rex R. Brubaker, The Bin Man." He had outlined to Ford Motor Company his service idea for setting up parts storage departments for dealers and convinced it of the soundness of his idea. He also did some work for Ford. About six months after Brubaker began purchasing bins from Berger on his own account, Berger discovered that Brubaker was furnishing service in accordance with his idea and objected to it on the ground that such activity would be generally detrimental to Berger. Brubaker persisted in continuing his service and in 1927 Berger cancelled his contract of employment. After learning of Berger's cancellation of the contract Ford *215 Motor Company contacted Brubaker and informed him of its desire to continue with his service and suggested that he make arrangements to obtain bins from a different source than Berger. About three weeks after cancelling Brubaker's contract of employment Berger approached him with respect to re-entering its employment and the parties entered into a new employment agreement under which Brubaker's commissions were fixed at the equivalent of 24 per cent of his net sales. This employment continued until 1942 or 1943. By 1928 Brubaker's commissions from Berger amounted to as much as $22,000 a year. During the years following his re-employment by Berger and until 1936 Brubaker, doing business as "Rex R. Brubaker, The Bin Man," worked with Ford Motor Company, General Motors, Chrysler and others in the development of his service idea. In developing his idea to render the dealer service in connection with the sale of bins, service in connection with the sale of bins, Brubaker first had to convince automotive manufacturers that his ideas for parts storage were of value to them and to the dealers. In some instances he had to prevail upon them to change their numbering systems to a group numbering *216 system which followed the anatomy of the car or truck and grouped parts from one section of the vehicle, for example, the engine, together numerically in the same way that the working mechanic would most normally require them. With respect to each automotive manufacturer Brubaker had to obtain the company's numerical list of parts, obtain information as to the size of the parts and the size of the bin in which each item would be stored. As new cars and new parts came out he revised his data so as to keep it current. After developing the foregoing data from the automobile manufacturers Brubaker had to ascertain from each individual dealer what dollar volume of parts the manufacturer required him to stock, the amount of space on the dealer's premises available for the storage of parts, both small and bulky, and the peculiarities of the dealer's clientele. The service idea as Brubaker developed it was, as an adjunct to selling standard automotive bins and shelving, to engineer the storage of a dealer's parts quota so that the parts could be stored in numerical sequence in accordance with a group numbering system. This storage system had to be engineered so that it would hold an adequate *217 number of those parts which the particular dealer would most need, taking into account the peculiar requirements of his location and type of clientele. In 90 per cent of the instances, Rex Brubaker would have to inform the dealer for what parts and in what quantity the storage system should provide. Further, the system had to be engineered to provide for about 25 per cent surplus space in the bins at those points in the bins where future expansion for new parts would most likely be required, so that the storage system would be flexible enough to cover those additions and changes of parts which constantly occur between major model changes. When such major model changes do occur, bringing with them a large number of new parts, the dealer's bin system must be rebuilt to accommodate the changed parts, and in such cases the dealer's existing bins are salvaged and rebuilt with whatever new additions are necessary to bring the system up-to-date, and provide surplus space for the changes of the future. In 1936 Berger again objected to Brubaker's developing service business as "Rex R. Brubaker, The Bin Man," and insisted that he, as their salesman, should no longer have his name appear in *218 connection with the rendering of this service. Although Berger knew that Brubaker had rendered and would continue to render this service in connection with his sales of bins, Berger was eventually satisfied by the formation of the petitioner, after which time Brubaker's name no longer appeared directly in connection with the rendering of the service. In 1936 petitioner and Brubaker entered into an employment arrangement whereby the latter was to receive for his services a commission of 8 per cent on the material sales by the petitioner. No commission was to be paid on the portion of the sales representing labor, or the engineering feature of the service idea. At the time the foregoing commission arrangement was entered into the average bin salesman or steel shelving salesman was then earning a commission of from 10 per cent to 15 per cent of net sales and Brubaker at that time was receiving a commission of 24 per cent of net sales as automotive representative of Berger. Brubaker considered the commission of 8 per cent as fair from his standpoint because he thought that the service idea would promote material sales of steel bins and shelving to the point where he would be adequately *219 compensated. The arrangement providing for a commission of 8 per cent on material sales continued in effect through 1944. In 1945 the petitioner's officers contemplated an expansion of the petitioner's business by opening branch offices and employing salesmen. During 1945 the petitioner opened a "service set-up" in Cleveland and in the latter part of that year or the first part of 1946 employed its first salesman other than Brubaker. In view of the contemplated expansion of the petitioner, which it was expected eventually would relieve Brubaker of considerable traveling, his commission agreement with the petitioner was modified so that his commission was 8 per cent on material sales up to $250,000, 4 per cent on such sales from $250,000 to $500,000, and 2 per cent on all such sales over $500,000. The foregoing percentages were effective for the years 1945 through 1947. The salesmen, other than Brubaker, employed by petitioner during 1945 through 1947 were employed on a salary basis due to the long period required to train them in the service feature of petitioner's work and to acquire the infomation necessary to plan and set up bin systems for dealers. As a part of Brubaker's *220 sales duties on behalf of the petitioner, it was necessary for him to keep in almost constant contact with a great many dealers and personnel of motor car companies. For that purpose he maintained extensive lists of dealers and motor car personnel by zones. To maintain his contacts and to sell for the petitioner, he traveled a great deal, spending more than 75 per cent of his time on the road. The petitioner paid his traveling expenses, including meals, lodging, and minor entertainment. Brubaker bore the expense of entertaining meetings of groups of motor car personnel and dealers. Brubaker personally made all of the petitioner's sales in 1944 and 1945. He made most of the petitioner's sales in 1946 and was instrumental in the starting or finishing of practically all of them. He made between 80 and 90 per cent of the sales in 1947. Everett McRae was president of petitioner during 1944. He became vice-president in 1945 and continued as such through 1947. Roy D. Angers became secretary and treasurer of the petitioner in 1945 and continued as such through 1947. As shown by petitioner's returns, they were paid salaries as follows for the indicated years: Year
Everett McRae
Roy D. Angers
1944
$4,855.46
1945
6,359.84
$10,705.43
1946
6,299.18
11,495.00
1947
6,885.00
12,625.00
*221 The following is a statement of the petitioner's net sales, net income, compensation paid and deducted for Brubaker, capital stock and earned surplus for the indicated years as shown by petitioner's income and excess profits tax returns for the years in question: Com-
Earned
pensation
Capital stock
surplus
Year
Net Sales
Net Income
to Brubaker
end of year
end of year
1944
$ 291,800.00
$ 9,335.51
$21,904.56
$ 3,500.00
$ 10,838.98 *
1945
879,644.36
38,156.76
37,056.30
3,500.00
23,446.00
1946
1,253.296.70
63,454.35
43,964.16
11,000.00
62,791.41
1947
1,507,341.96
116,111.62
48,144.62
27,000.00
134,958.45
No dividends were paid by petitioner during the years 1944 through 1947. In determining the deficiencies here involved the respondent determined that compensation paid by petitioner to Brubaker in excess of $14,999, $20,000, $25,000 and $25,000 for the years 1944, 1945, 1946 and 1947, respectively, did not constitute an ordinary and necessary business expense and accordingly disallowed $6,905.56, $17,056.30, $18,964.16 and $23,144.62 of the deductions *222 taken for the respective years. Opinion The factual question before us is whether the amounts of $21,904.56, $37,056.30, $43,964.16 and $48,144.62 paid to Brubaker during 1944, 1945, 1946 and 1947, respectively, constituted reasonable allowances as compensation to him for services rendered during those years within the meaning of section 23 of the Internal Revenue Code. [1]
During the middle 1920's Brubaker conceived and began to employ the idea of rendering automobile dealers the special service of planning and installing a set of storage bins especially adapted to their particular location and requirements. Until 1936 he rendered this service in his own business which he conducted in his own name. Because of objections by Berger to his use of his name in that manner, the petitioner was formed in 1936 and such business was thereafter, and throughout the years involved herein, conducted by petitioner. *223 Upon the formation of the petitioner, Brubaker and petitioner entered into a contract whereby for his services he was paid a commission of 8 per cent of petitioner's material sales. This contract continued in effect through 1944. The contract was then modified so that for 1945 and later years he was paid a commission computed at 8 per cent on material sales up to $250,000, 4 per cent on material sales from $250,000 to $500,000, and 2 per cent on such sales in excess of $500,000. In connection with his employment Brubaker bore his entertainment expenses. Although Brubaker was treasurer of the petitioner in 1944 and president in 1945, 1946 and 1947, he received no salary as such. His entire compensation was derived from commissions and these were contingent and dependent solely on sales. From about 1927, when Brubaker entered into his second contract with Berger, until 1942 or 1943, when he terminated his employment with Berger, his commissions from Berger were the equivalent of 24 per cent of net sales. When he entered into his contract with the petitioner in 1936 for a commission of 8 per cent on all material sales, the average bin and steel shelving salesman was being paid a commission *224 of from 10 per cent to 15 per cent of net sales. Brubaker had conceived and developed the idea or method on which the petitioner's business was based. He personally made all the petitioner's sales in 1944 and 1945, made most of its sales in 1946, and was instrumental in the beginning or closing of practically all of the remainder, and made from 80 per cent to 90 per cent of its sales in 1947. Obviously Brubaker was the mainstay of the petitioner's business and it was largely due to him and his efforts that the petitioner's sales expanded from approximately $290,000 in 1944 to more than $1,500,000 in 1947. Under the circumstances presented and in view of the fact that Brubaker's compensation was based on a contract entered into several years before the taxable years in controversy, it is our opinion that the amounts paid to him by petitioner and deducted by it in the respective years constituted reasonable compensation and were deductible in full by the petitioner. Cf. Streckfus Steamers, Inc., 19 T.C. 1. Issue 2. Deductibility of amounts paid to Rex R. Brubaker in excess of petitioner's obligations paid by him Findings of fact Prior to 1945 all purchases made *225 by petitioner were for cash and it had no established credit rating. During 1945 there was a considerable increase in, or expansion of, its business. Its sales in 1945 were more than triple its 1944 sales. Its accounts receivable increased from approximately $23,100 at the beginning of 1945 to $60,568.24 at the end of the year. During that year its inventories rose from $24,292.25 to $67,779.02. The petitioner's capital assets increased from $4,380.30 at the beginning of 1945 to $55,037.52 at the end of the year. Petitioner's cost of material rose from $172,458.53 in 1944 to $578,306.06 in 1945. Its expenses for salaries and wages increased from $46,362.47 in 1944 to $104,147.11 for 1945. These developments caused a shortage in petitioner's working capital. Since petitioner had no established credit rating, the two companies which supplied it with materials, Lyon Metal Products, Incorporated, and Sheet Metal Products, declined to sell merchandise to it on credit in 1945 unless Brubaker, personally, agreed to be responsible for payment. This he agreed to do. The bills to petitioner for purchases of merchandise from Lyon provided for a discount of 2 per cent for prompt payment if *226 paid by the 10th of the month following the date of the bill. The bills from Sheet Metal provided for a discount of 2 per cent if payment were made within 30 days from the date of the bill. With respect to bills which the petitioner would not have funds for making payment within the discount periods, the petitioner's bookkeeper contacted Brubaker a week or more in advance of the expiration of the discount period advising him to that effect. Thereafter, and within the discount period, Brubaker made payment of the bills, less the discount. Afterwards as petitioner came into funds it paid Brubaker the full amount of the bills without any discount. In the years following 1945 the petitioner's financial condition had improved to the extent that Lyon and Sheet Metal were willing to, and did, sell merchandise to it on credit without requiring Brubaker to agree to be responsible for payment therefor. In determining the deficiency for 1945 the respondent determined that during 1945 the petitioner paid Brubaker $8,328.41 in excess of the amount of the petitioner's obligations paid by him during that year, and that the amount was not deductible by petitioner either as a part of the cost *227 of sales in computing gross income or as an ordinary and necessary business expense. In his individual income tax return for 1945 Brubaker reported $8,328.41 as income received from factoring accounts payable for petitioner. Opinion The respondent contends that the $8,328.41 in controversy represented a distribution of petitioner's profits to Brubaker or an amount of its taxable income which it attempted to assign to him and that, therefore, the petitioner is not entitled to any deduction therefor. In support of his position the respondent relies on the holding in Beck-Brown Realty Co., 46 B.T.A. 1225. The petitioner contends that since it was unable to pay within the discount periods the merchandise bills to which the $8,328.41 related, and that since it was not until after the expiration of the discount periods that it was able to, and did, make payment of the bills, and then paid only the amount that it would have had to pay if Brubaker had not made payment within the discount periods, the respondent erred in disallowing the amount in question. In Beck-Brown Realty Co., supra, relied on by the respondent, the taxpayer borrowed from Parshelsky, *228 its sole stockholder, a sum of money which it thereupon loaned to Ageloff Realty Company. Ageloff paid the taxpayer certain commissions for making the loan and for a renewal thereof. The taxpayer contended that the commissions so received were not income to it but belonged to Parshelsky as consideration for furnishing the money to make the loan. Since the evidence showed that the taxpayer had acted as principal in making the loan to Ageloff, and in renewing it, and had failed to show any agreement between the taxpayer and Parshelsky that the commissions were to belong to him, it was held that the commissions constituted income to the taxpayer. We fail to see the applicability of the holding in that case to the instant case. Here, the petitioner bought merchandise from two suppliers at stated selling prices. If payment were made therefor within stated discount periods, the suppliers would accept payment of 2 per cent less than the selling prices as full settlement for the merchandise. Otherwise, full settlement could be made only by payment of the entire amount of the selling prices. If the suppliers of merchandise had sold petitioner's indebtedness to a factor, or other third party, *229 prior to the expiration of the discount periods, and after the expiration of such periods the petitioner had made payment of the stated selling prices, we think there would be no question as to the petitioner being entitled to the full benefit of the payments it made. In the instant case there was no sale by the suppliers to Brubaker of the petitioner's indebtedness, but he was responsible for its payment. Does the fact that he made payments during the discount periods of bills, which the petitioner would not have paid during those periods, and later received payment of the full amount of the bills from the petitioner, require that the payments thus made by petitioner be accorded a different treatment than if they had been made to a broker who had purchased the petitioner's indebtedness? In our opinion, no different treatment is required. Consequently, we hold that the petitioner is entitled to deduct the amount in controversy. Issue 3. Deductibility of certain traveling and other expenses of Rex R. Brubaker Findings of Fact During 1945, 1946 and 1947 the petitioner reimbursed to Brubaker the amounts of $6,623.78, $6,026.81 and $4,869.58, respectively, for expenditures made *230 by him for traveling expenses, including expenditures for oil and gasoline and for minor entertainment expenses in the course of his employment by petitioner. The weekly travel expense reports submitted by Brubaker to petitioner, and on the basis of which he was reimbursed, were made by him from his travel expense books in which he recorded his day-by-day expenditures. In its returns for the years 1945, 1946 and 1947 the petitioner deducted the amounts reimbursed by it to Brubaker during the respective years. Of the amounts so deducted the respondent disallowed $5,353.24 for 1945, $3,700 for 1946, and $2,900 for 1945. Opinion The ground upon which the respondent made the disallowances was merely the general one that the expenditures had not been supported by the necessary evidence. At the hearing the petitioner placed in evidence Brubaker's travel expense books in which he recorded his day-by-day expenses, and from which he prepared his weekly travel reports, on the basis of which he was reimbursed. Apparently the respondent no longer questions the existence of evidence to show that Brubaker made the expenditures for which he was reimbursed, since he now takes the position *231 that the amounts disallowed by him included expenditures incurred by Brubaker in connection with the Automotive Inventory Service Company, which was operated by Brubaker as a sole proprietorship, and for certain personal expenses of Brubaker. Brubaker testified that all the expenditures for which he was reimbursed by petitioner were made on behalf of the petitioner, and that none of them were made on behalf of Automotive Inventory Service Company or for his personal expenses. Brubaker's testimony also shows that he devoted little of his time to the affairs of Automotive Inventory Service Company, and that its operations and business were conducted by a manager who had full charge. In view of the foregoing, and in the absence of evidence establishing the contrary, we are unable to conclude that the reimbursements in controversy included any expenditures except those made on behalf of the petitioner. Accordingly, we hold for petitioner on this issue. Issue 4. Commissions received by petitioner and credited to Rex R. Brubaker Findings of Fact In the latter part of 1942 or early in 1943 the petitioner entered into an agreement with Lyon Metal Products, Incorporated, under which *232 the petitioner acted as distributor of that corporation's products, buying such products directly from the corporation. In 1944 Brubaker entered into a contract with Lyon whereby he personally became Lyon's exclusive automotive representative in the territories covering the Flint and Detroit zones (Michigan) and the Cleveland zone (about one-half of Ohio). Under this agreement Brubaker was to be paid a commission of 25 per cent on merchandise shipped and invoiced by him and 12 1/2 per cent on merchandise invoiced and shipped by Lyon, and on which it took the credit risk. Most of the commissions received by Brubaker were 12 1/2 per cent because they arose under the territorial franchise and not from sales made by him. Prior to February 1946 Brubaker was receiving commissions from Lyon under the agreement. On February 26, 1946, petitioner and Lyon executed an agreement which provided that petitioner would receive discounts as a distributor and commissions upon sales of merchandise under a territorial franchise covering the State of Michigan and eleven counties in Ohio. By an addendum of the same date to the agreement it was provided that "this agreement cancels and supersedes our *233 tentative agreement of June 7, 1944, except that Lyon will continue to pay Automotive Bin Service 12 1/2% commissions on shipments into your territory on remaining unshipped car manufacturers orders." In February 1946 Lyon had a large backlog of unfilled orders, partly due to the limitations of its manufacturing facilities and its inability to get steel, and partly because it failed to get into post-war production on some of its lines for as long as one and one-half to two years. Petitioner as a distributor for Lyon had had pending with Lyon many unfilled orders on February 26, 1946, which were delayed or on which it had no assurance that Lyon would resume manufacture of the items ordered. Commission checks from Lyon for March and April 1946 were made payable to Brubaker and were sent to him. Thereafter, commission statements were sent by Lyon to the petitioner, as were commission checks which were drawn payable to petitioner. The petitioner's secretary-treasurer, who handled the commission checks and statements, concluded that commission checks payable to, and received by, petitioner for the following months and in the indicated amounts represented commissions payable to Brubaker *234 and caused them to be credited to his personal account on petitioner's books: May 1946
$ 418.92
July 1946
81.71
Aug. 1946
339.42
Sept. 1946
436.22
Oct. 1946
504.90
$1,781.17
Of the above-mentioned checks for commissions for May, July, August and September the amounts of $151.78, $60.90, $26.70 and $424.74, respectively, or a total of $664.12, represented commissions due Brubaker. In determining the deficiency for 1946 the respondent determined that during the year the petitioner received commissions of $2,528.96 from Lyon which it credited to Brubaker, and that such commissions constituted taxable income to the petitioner. Opinion The amount of $2,528.96 by which the respondent has increased the petitioner's taxable income is composed of the total of the checks set out in our findings, $1,781.17, and $749.79 representing the total of various other checks. The respondent concedes that the $749.79 did not represent sales commissions, and that he erred in including the amount in the petitioner's income. The petitioner contends that the $1,781.17 represented commissions that were due Brubaker on orders placed with Lyon prior to February 26, 1946, when *235 petitioner succeeded Brubaker as exclusive territorial representative of Lyon. Petitioner rests this contention on the testimony of its secretary-treasurer as to his determination to that effect, and upon the fact that the checks for the amount in question were accompanied by commission statements and by copies of shipping sheets which in a number of instances stated that the commissions were to be paid to Brubaker. Conceivably, confusion could have arisen as to what checks or portions of checks from Lyon represented commissions to petitioner or to Brubaker. However, so far as shown, petitioner made no attempt to clear up any possible confusion by taking up the matter with Lyon and ascertaining definitely what amounts were commissions due petitioner and what amounts were commissions due Brubaker. From a consideration of all the evidence bearing on the question, including copies of shipping sheets placed in evidence, we have found as a fact that $664.12 of the amount in controversy represented commissions due Brubaker. That amount was not income to the petitioner. The respondent's action as to the remainder of the $1,781.17 is sustained. Issue 5. Maintenance and repairs Findings *236 of Fact The respondent determined that an amount of $2,692.30 deducted by petitioner as maintenance and repairs for 1945 represented capital expenditures which were not deductible as ordinary and necessary business expenses but were recoverable over the estimated useful life of the assets thereby acquired, and that the depreciation deductions allowable with respect thereto were $7.81 for 1945 and $47.14 for 1946. Bills or portions of bills comprising $1,429.41 of the $2,692.30 were as follows: 1. Arthur Dias
$ 555.00
2. Harry Anderson
125.00
3. M. E. Bowers
749.41
$1,429.41
The bill of Arthur Dias, dated November 8, 1945, was for work in repairing a side wall of the petitioner's building which had been damaged by trailers and trucks; in relocating a sliding door in a wall so as to give trucks more access and maneuvering space; altering a recently installed paint room so that it would comply with the fire regulations; removal of the coal chute from the paint room and relocating it at the rear of the building. One hundred dollars of the amount of the bill was for repairs and maintenance. The petitioner acquired its building in April 1945 and shortly after *237 it moved into the building a considerable buckling of the floor of the front office developed. In June 1945 the petitioner employed Harry Anderson, who replaced the floor with tile at a cost of $125. At the time of its acquisition in 1945 the petitioner's old building was equipped with a 110-volt electrical system. After acquiring the building the petitioner had the Globe Electric Company add a system of 220-volt capacity. Subsequently the local utility company advised petitioner that numerous fluctuations were found in the area of petitioner's building and that it was noted that petitioner was using more electrical power than its system of lines was capable of safely carrying. The utility company recommended that petitioner make some improvements in its system, such as incorporating the necessary panels and heavier wire and fuses to take care of the additional electrical load. As a result the petitioner employed M. E. Bowers who made the recommended changes at a cost to petitioner of $749.41. In making the changes a portion of the 220-volt system was removed. The remainder was allowed to remain in the building. Opinion Of the $2,692.30 which the petitioner deducted as repairs *238 and maintenance and which the respondent determined to be capital expenditures, the respondent concedes that he was in error to the extent of $582.08. The petitioner concedes the correctness of the respondent's determination to the extent of $680.81. That leaves for determination the correctness of the respondent's action as to the items covered by the three bills set out in our findings of fact, totaling $1,429.41. From the evidence before us we have found as a fact that $100 of the amount of the bill of Arthus Dias was for repairs and maintenance. On the basis of the meager evidence relating to the remaining items covered by that bill and by the bills of Harry Anderson and M. E. Bowers, we are unable to find that the respondent erred in making his determination. As to them, his action is sustained. Issue 6. Depreciation Findings of Fact On April 19, 1945, the petitioner purchased the premises - land and building - known as 9900 Freeland Avenue, in Detroit, Michigan. On July 1, 1946, the petitioner sold the premises to Brubaker Holding Corporation, which in turn leased back the premises to the petitioner for a term of nine years. Rex R. Brubaker and Roy D. Angers, president *239 and secretary, respectively, of the petitioner, were also president and secretary, respectively, of Brubaker Holding Corporation. The sale of the premises and the lease-back thereof resulted from a series of discussions between officers of the petitioner and the petitioner's accountant during the first half of 1946. In its general ledger the petitioner carried an account designated No. 13 in which it kept a record of the cost of the land, building, certain improvements thereto and depreciation on the building and improvements. The selling price of the premises was determined by reducing the cost of the land, building and improvements by the depreciation sustained thereon and by the mortgages outstanding on the premises. In its general ledger the petitioner maintained an account designated No. 14 and entitled "Improvements To Building." Between the date of the petitioner's acquisition of the building in 1945 and the sale thereof in July 1946 the petitioner capitalized in account No. 14 items having a total cost of $9,863.26. The items so capitalized included, among others, spray booths of a cost of approximately $3,000, paint room, enclosures, dust collectors, two exhaust stacks 36 *240 inches in diameter extending about 18 feet above the building with a five horsepower motor attached to each, temporary office partitions, office counters, and railings. At the time of the sale of the premises it was found that most of the items capitalized in account No. 14 had been acquired to facilitate the petitioner's operations and were peculiarly adapted thereto. In view of that fact it was decided by petitioner's officers that ownership of the items so capitalized would remain in the petitioner and not be sold or transferred to Brubaker Holding Corporation. The deed from petitioner to Brubaker Holding Corporation transferring ownership of the premises does not contain any provision reciting that the items capitalized in account No. 14, or any other properties, were excepted from the transfer. However, a few years later when petitioner moved from the premises it removed all of such items as had not been previously discarded or whose cost of removal would exceed their cost of replacement new. The items capitalized in account No. 14 were not sold by petitioner during 1946. Opinion The only question under this issue is whether after the sale in July 1946 of the premises *241 situated at 9900 Freeland Avenue the petitioner continued to own the items capitalized in account No. 14. The respondent's position is that such items comprised part of the premises sold and that since in the deed to the premises there were no exceptions or exclusions of any properties from the sale, such items passed to Brubaker Holding Corporation in July 1946 and thereafter were not owned by petitioner. Petitioner contends that there was no sale of the items in question and that it continued to own them. Although it is true, as respondent contends, that the deed by which the petitioner transferred the premises to Brubaker Holding Corporation contained no reference to any exceptions or exclusions of any properties on the premises, we do not think this is of significance in the situation presented. While the evidence does not show all the items contained in account No. 14, it does show the principal items. From what is shown, it is apparent that instead of being carried on petitioner's books as "Improvements To Building," many of the items might well have been carried as machinery and equipment, while others could have been carried as fixtures. Further, the evidence shows that because *242 most of the items in the account were peculiarly adapted to petitioner's business and had been acquired to facilitate its operations, the petitioner's officers decided that petitioner should retain ownership of the items. Considering the foregoing in connection with the fact that when the petitioner moved from the premises a few years after 1946 it removed all the items included in the account that had not been discarded or which it was not economically feasible to remove, we have found as a fact that the items in the account were not sold by petitioner in 1946. Issue 7. Bad Debts Opinion The respondent determined that for 1947 the petitioner was entitled to a deduction of $3,579.67 for bad debts. The parties have stipulated that the petitioner was entitled to a deduction of $4,995.26 for that purpose. The latter amount will be allowed in a recomputation of the deficiency for that year. Decision will be entered under Rule 50. Footnotes
*. Earned surplus at the beginning of 1944 was $6,319.85.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩